**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x

KATHERINE PRIESTLEY,

                        Plaintiff,

      -against-

MCDONALD COMRIE, PHILLIP YEE, DR. DAVID
ERLANGER, PANMEDIX INC., ELECTRONIC
KNOWLEDGE PUBLISHING, INC., and
HEADMINDER, INC.,

                    Defendants.

-------------------------------------------------------------------x

07 Civ. _____

**COMPLAINT**

JURY DEMANDED

**PLAINTIFF KATHERINE PRIESTLEY**, by her attorneys Nesenoff &

Miltenberg LLP, as and for her Complaint, respectfully alleges as follows:

## GRAVAMEN OF THE ACTION

    1.    This diversity action is brought by Plaintiff Katherine Priestley, the owner of

18.85% of the common stock of Defendant PanMedix, Inc. and the holder of a "Senior

Secured Promissory Note" issued by Defendant PanMedix, Inc. and guaranteed by

Defendant Electronic Knowledge Publishing, Inc.:

    2.    In this action the Plaintiff seeks:

        (i)  to obtain repayment of the <u>one-year</u> $750,000 "Senior Secured

Promissory Note" issued by PanMedix, Inc. dated April 6, 2001, that has been overdue to

be repaid in full with interest for almost five years now;

        (ii) to obtain repayment of an $85,000 loan that was made in April 2002

subject to the "Senior Secured Promissory Note" and that has also been overdue to be

repaid with interest;

(iii) to recover derivatively, on behalf of and for Defendant PanMedix, Inc., the damages proximately caused by breaches of fiduciary duty of loyalty committed by Defendant McDonald Comrie (Chief Executive Officer and President of Defendant PanMedix, Inc., Chief Executive Office of Headminder, Inc.), Philip Yee (Director and technology officer of Defendant PanMedix, Inc., Director of Operations of Headminder, Inc) and David Erlanger (Chief Scientific Officer of Defendant PanMedix, Inc., and Headminder Inc.); and

(iv) to recover derivatively, on behalf of and for Defendant PanMedix, Inc., the damages proximately caused by breaches of fiduciary duty of due care committed by Defendant McDonald Comrie, (the Chief Executive Officer and President of Defendant PanMedix, Inc.), Philip Yee (Director and technology officer of Defendant PanMedix, Inc.) and David Erlanger (Chief Scientific Officer of Defendant PanMedix, Inc.).

## PARTIES

3.  Plaintiff Katherine Priestley ("Plaintiff Priestley") is a citizen and resident of the United Kingdom who resides at 9 The Vale, London, United Kingdom.  Plaintiff Priestley is the owner of 18.85% of the common stock of Defendant PanMedix, Inc. and the holder of a "Senior Secured Promissory Note" issued by Defendant PanMedix, Inc. and guaranteed by Defendant Electronic Knowledge Publishing, Inc..

4.  Defendant McDonald Comrie ("Defendant Comrie") is an individual who resides at 20 Bay St. Landing, Apt. B3D, Staten Island, New York 10301, and who maintains an office at 15 Maiden Lane - Suite 205, New York (Manhattan), New York 10038.  Defendant Comrie is the Chief Executive Officer and President of Defendant PanMedix, Inc. and the President of Defendant Electronic Knowledge Publishing, Inc..

5. Defendant Phillip Yee ("Defendant Yee") is an individual who is a resident of New York and maintains an office at 15 Maiden Lane - Suite 205, New York (Manhattan), New York 10038. Defendant Yee is a Director and technology officer of Defendant PanMedix, Inc..

6. Defendant Dr. David Erlanger ("Defendant Erlanger") is an individual who is a resident of New York and maintains an office at 15 Maiden Lane - Suite 205, New York (Manhattan), New York 10038. Defendant Erlanger was the President of Defendant Headminder, Inc. before its *de facto* merger with Defendant PanMedix and is the Chief Scientific Officer of Defendant PanMedix and Defendant Headminder.

7. Defendant PanMedix, Inc. ("PanMedix") is a company that is incorporated under the laws of the state of Delaware and that maintains its main offices at 15 Maiden Lane - Suite 205, New York (Manhattan), New York 10038.

8. Defendant Electronic Knowledge Publishing, Inc. ("EKP") is a company that is incorporated under the laws of the state of Delaware and that maintains its main offices at 15 Maiden Lane - Suite 205, New York (Manhattan), New York 10038.

9. Defendant Headminder, Inc. ("Headminder") is a company that is incorporated under the laws of the state of New York and that has maintained its main offices at an office at 15 Maiden Lane - Suite 205, New York (Manhattan), New York 10038.

## JURISDICTION AND VENUE

10. Jurisdiction is founded upon diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(1), and the amount in controversy, exclusive of interest and costs, exceeds the sum of seventy-five thousand dollars ($75,000.00).

11. Venue lies in this district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**A.   Formation and Early Operation of Defendant Businesses.**

12.   In 1995, Xcape, Inc. ("Xcape") was founded by Defendant Comrie, Defendant Yee and Darin Kaplan to create software for developing on-line education systems.  Defendant Comrie became a Director and the Chief Executive Officer and President of Xcape; Defendant Yee became a Director of Xcape; and Darin Kaplan became a Director and the Secretary of Xcape.

13.   In May 1997, Plaintiff Priestley first invested in Xcape by purchasing shares of common stock and made that investment decision based upon representations by Defendant Comrie about his business plan.  During its first years of operation, Xcape focused on its educational business.

14.   In October 1999, Xcape signed a joint venture and revenue sharing agreement with Defendant Erlanger and his company Headminder to computerize the standard paper and pencil tests used for testing cognitive impairment by clinical psychologists. Headminder was a newly incorporated separate company with separate shareholders and directors.  The original agreement between Headminder and Xcape allowed for revenue sharing from products jointly developed with each company responsible for its own development costs.

15.   While a formal merger was not effected, in 2000 Headminder and PanMedix effectively merged when PanMedix undertook to pay all the costs of Headminder,

including all staff costs. PanMedix became the corporation name and Headminder a trade name.

16.   As a result of and acknowledgment of this merger, income derived from the sale of the jointly devised products was kept 100% by PanMedix and not divided between the two businesses as their contract originally contemplated. Thus, after the signing and putting into effect the joint venture agreement between Headminder and PanMedix, there was a *de facto* merger of the two companies, and Defendant Erlanger became the second most significant officer of PanMedix -- its Chief Scientific Officer.   Defendant Comrie became the CEO of Headminder, and Defendant Yee became the Director of Operations (as listed on their wedsite).

17.   In February 2000, Xcape did a 1000 for 1 stock split, and Xcape changed its name to "PanMedix, Inc."and created a wholly owned subsidiary named "Electronic Knowledge Publishing, Inc." (defined above as "EKP").  The legacy educational business was placed in EKP, while the new business of cognitive testing was pursued under the name of PanMedix.

18. Defendant Comrie became the President of EKP.  Defendant Comrie proposed to sell EKP in order to finance the new PanMedix business, but the proposed sale of EKP was not pursued by Defendant Comrie and/or Defendant Yee.   Indeed, while the firm initially had ongoing revenue, Defendant Comrie mismanaged the operation of EKP, and the business of EKP was allowed to waste away.

19.   In early Spring 2001, PanMedix was experiencing a shortage of cash to fund operations in PanMedix.  Defendant Comrie had not arranged the sale of the legacy

educational business then operating as EKP. Furthermore, Defendant Comrie did not obtain other sources of financing for PanMedix.

**B.      Plaintiff Priestley's $750,000 Loan Per The**
         **"Senior Secured Promissory Note."**

20.   Starting by March 2001, Defendant Comrie approached certain of the firm's current investors seeking additional funds.

21. In an effort to obtain such funding from Plaintiff Priestley, on or about March 15, 2001, Defendant Comrie provided, to Plaintiff Priestley, a listing of the Company's assets, including a list of the U.S. Patents filed assigned to PanMedix, PanMedix software, software contract rights, additional intangibles and electronic data processing rights, including rights to the data from the software tests jointly developed by PanMedix and Headminder.

22.   Plaintiff Priestley was also asked to be a member of the Board of Directors of PanMedix, and a Consent of Shareholders dated March 15, 2001, to that effect was executed.  As a result of her new status as a Director, in April 2001, Plaintiff Priestley was asked to sign and did sign, as a Director of PanMedix, an Action By Consent of the Board of Directors In Lieu of a Special Meeting.

23.   On or about April 5, 2001, Plaintiff Priestley sent a letter to PanMedix confirming her agreement to the terms of a "Senior Secured Promissory Note" and her acceptance to make loans in accordance with that "Senior Secured Promissory Note."

24.   On or about April 6, 2001, the "Senior Secured Promissory Note" was provided to Plaintiff Priestley by PanMedix and was guaranteed by EKP.

25.  The "Senior Secured Promissory Note" evidenced a debt of $750,000.00 in principal, with interest at 11.5% for the one-year term of the "Senior Secured Promissory

Note" and at 13% per annum from April 6, 2002 thereafter until the principal was paid. The "Senior Secured Promissory Note" was signed for PanMedix by Defendant Comrie in his capacity as PanMedix's President and (with respect to the security and general provisions sections) for EKP by Defendant Comrie in his capacity as EKP's President. An "Unconditional Agreement of Guarantor" was signed for EKP by Defendant Comrie in his capacity as EKP's President.   The "Obligors" under the "Senior Secured Promissory Note" were PanMedix and EKP.

26.   Under the terms of the "Senior Secured Promissory Note," an event of default under the "Senior Secured Promissory Note" committed by PanMedix triggered the express right of Plaintiff Priestley, as "Holder," to declare by written demand the entire unpaid principal amount of the "Senior Secured Promissory Note" and unpaid interest due and owing, at which time the "Senior Secured Promissory Note" and all accrued interest would become and be forthwith due and payable.   "Events of default" include, but are not limited to: (i) failure to pay principal upon maturity; (ii) failure to pay interest during default; (iii) failure to provide updated information with respect to the security; and (iv) failure to provide regular financial information with respect to the business.

**C.     Plaintiff Priestley's Additional Acquisition of PanMedix Stock and $85,000 Loan Subject To The "Senior Secured Promissory Note."**

27.   In August 2001, Plaintiff Priestley acquired 20,777 shares of PanMedix common stock from Darin Kaplan for $100.   Thereafter, Plaintiff Priestley owned 18.85% of the PanMedix shares, and Darin Kaplan no longer was involved in PanMedix as an officer or Director.

28.   On April 6, 2002, the $750,000 principal of the "Senior Secured Promissory Note" was due to be repaid, but PanMedix was not in a financial position to undertake

repayment. Consequently, in March and April 2002, Defendant Comrie conferred with Plaintiff Priestley as to what to do about her "Senior Secured Promissory Note" with PanMedix, stating that PanMedix had been able to make interest payments for the previous year but could not repay the principal. Plaintiff Priestley was told that if she called her "Senior Secured Promissory Note" due, she would bankrupt PanMedix, the company would cease operating and that the value of the collateral would not come close to the value of the loan as PanMedix's value was in its intellectual property and related licenses.

29. Defendant Comrie represented that he would be able to run the business profitably on a going forward basis, and asked that Plaintiff Priestley loan PanMedix $85,000.00, to be subject to the "Senior Secured Promissory Note" in order to give the management time to seek professional funding and recapitalize the business.

30. Plaintiff Priestley agreed to defer the payment of principal of the "Senior Secured Promissory Note" on the understanding the interest going forward would be paid quarterly as established at the new rate of 13% and on time.

31. Plaintiff Priestley also agreed to the further loan to PanMedix of $85,000 subject to the "Senior Secured Promissory Note". Deferment of principal repayment was agreed for the short term, but only until capital was raised from a professional venture capital company, which was a matter of high importance and priority at PanMedix and which was expected to occur well within a year.

32. On or about April 24, 2002, Plaintiff Priestley sent two letters to Defendant Comrie. The first letter: (i) listed the specific dates of the loans that Plaintiff Priestley in fact made under the "Senior Secured Promissory Note" in the period of April 6, 2001 to

August 13, 2001, loans which totaled $750,000.00; (ii) noted that she had received to date $74,391.17 in interest payments on the amounts loaned; and (iii) noted the increase in the interest to 13% for the period subsequent to April 6, 2002.   The second letter (i) acknowledged receipt of $74,391.17 in interest payments on the amounts loaned; (ii) noted that PanMedix had 90 days from April 5, 2002, to make full repayment of the loan; and (iii) noted that the interest from April 6, 2002 on would be 13%.

**D.      Breaches of Fiduciary Duty of Care: Failures
         To Obtain Financing and Declining Business.**

33.    Subsequent to the April 2002 forbearance and additional loan by Plaintiff Priestley, Defendant Comrie advised Plaintiff Priestley of various business ideas and areas of opportunity.   Defendant Comrie's reports sounded promising, but for the next year, little revenue was generated by such efforts.

34.    In May 2003, Plaintiff Priestley, having grown tired of the lack of business development at PanMedix, drew up an action plan memorandum that focused on the "cash crisis" at the company,   a "cash crisis" which was said to result from (i) undercapitalization of the business and (ii) little generation of revenue from product sales.   Both of these problems had been regularly and repeatedly discussed with Defendant Comrie by Plaintiff Priestley, and Defendant Comrie had responded with a list of new hopeful business opportunities.   But very little of these business opportunities ever materialized as the accounts of the business will show.

35. Plaintiff Priestley had concluded and the directors had agreed that PanMedix needed to attract money from established venture capital sources and to attract professional and experienced management to bring successfully to market PanMedix developed products.

36.   In order to assist PanMedix in realizing its potential for success, Plaintiff Priestley used her extensive contacts in private venture capital companies to provide PanMedix with introductions to bio-venture firms such as Abingworth, Oxford Bioscience and MPM Capital and contacts in investment banks such as Goldman Sachs.

37.   Defendant Comrie and Defendant Yee did not genuninely pursue these introductions as any such deal would involve a decrease in their personal share ownership and management control over PanMedix.   As a result, Defendant Comrie allowed the opportunities afforded by the introductions to private venture capital companies and investment banks to slip away, actions in which Defendant Yee participated and for which Defendant Yee was fully accountable.   While the lack of capital financing endangered the PanMedix business, Defendant Comrie and Defendant Yee maintained their personal ownership share of PanMedix.

38.   On or about June 23, 2003, Plaintiff Priestley sent a memorandum to Defendant Comrie as a cover for her two letters dated June 23, 2003, to Defendant Comrie.   In the cover memorandum, Plaintiff Priestley explained, among other things, that she had received a copy of the proposed Loan Note offered to PanMedix from a company named Little Rock Ltd., a proposed Loan Note which Plaintiff Priestley viewed to be in violation of her "Senior Secured Promissory Note."   Defendant Comrie had negotiated this proposed Loan Note without Plaintiff Priestley's knowledge, knowing full well it would place PanMedix in breach of the Plaintiff Priestley's "Senior Secured Promissory Note" because the proposed Loan Note to Little Rock Ltd. would subordinate the debt of the "Senior Secured Promissory Note."   Plaintiff Priestley's memorandum of June 23, 2003, stated that she (Plaintiff Priestley) understood that PanMedix had working

capital issues but the Little Rock loan of $135,000 was not going to fundamentally solve them. She was frustrated over what she called Defendant Comrie's stalling and inactivity with respect to approaching venture capital companies, and that the explanation for Defendant Comrie's actions was a desire on his part not to give up personal equity.

39.   On information that only came to light in December 2005, Defendant Comrie did do a deal with Little Rock Ltd. in June 2003, resulting in some cash being furnished to PanMedix, but the terms were never disclosed to Plaintiff Priestley, as required by the "Senior Secured Promissory Note," and those terms may violate the "Senior Secured Promissory Note."   Plaintiff Priestley criticized Defendant Comrie for damaging PanMedix due to the lack of available capital over the prior twelve months, a failure for which Defendant Yee was also responsible.

40.   Along with the memorandum dated June 23, 2003, Plaintiff Priestley sent to Defendant Comrie a "Notice of Default" dated June 23, 2003, to PanMedix because the principal amount under the "Senior Secured Promissory Note" was not paid upon maturity or at any time thereafter -- an event of default under the "Senior Secured Promissory Note" -- and because interest had not been paid on the loans per the "Senior Secured Promissory Note" -- also an event of default.   In the June 23, 2003 Notice of Default, Plaintiff Priestley declared, as "Holder" of the "Senior Secured Promissory Note," the entire principal amount of the "Senior Secured Promissory Note" and all accrued interest forthwith due and payable.

41.   Also on or about June 23, 2003, Plaintiff Priestley sent a separate letter to Defendant Comrie formally advising him that she had recently been informed that Defendant Comrie had attempted to issue a promissory note in violation of "Senior

Secured Promissory Note" and she considered the action illegal under section 5.2(b) of the "Senior Secured Promissory Note." Plaintiff Priestley threatened legal action if the "Senior Secured Promissory Note" were violated.

42.   Despite PanMedix's weak management, Plaintiff Priestly continued to see potential in the underlying business of the company. On or about September 9, 2003, Plaintiff Priestley sent a memorandum to the two senior officers of the company, Defendant Erlanger and Defendant Comrie, entitled "Moving the business forward." In the memorandum, Plaintiff Priestley expressed concern that there was a lack of progress in moving the business forward along the fund raising strategy discussed in June 2003 -- despite many more new firms being introduced to Defendant Comrie -- and that the lack of external private equity interest meant PanMedix would have no real future. Plaintiff Priestley chided Defendant Comrie for continued failure to develop a business plan for presentation to private equity firms and asked him to draw up a list of private equity firms to target and to contact those firms.

43.   Notwithstanding Plaintiff Priestley's memoranda and letters in June and September 2003, Plaintiff Priestley's attention was substantially diverted away from PanMedix starting in June 2003 and continuing about one and one-half years thereafter. In June 2003, Plaintiff Priestley's father underwent quadruple by-pass heart surgery. In July 2003, Plaintiff Priestley's mother suffered a near fatal stroke and became terminally ill, requiring Plaintiff Priestley's care and attention, as did Plaitniff Priestley's husband who also became terminally ill. In September 2003, Plaintiff Priestley had twin babies. In June 2004, Plaintiff Priestley's husband passed away; and in September 2004, Plaintiff Priestley's mother passed away.

44.   Defendant Comrie was aware of how Plaintiff Priestley's family sorrows disabled her from attention on PanMedix.  It was thus during this time from mid-2003 through 2004 and into 2005, that Defendant Comrie, promising good business for PanMedix, persuaded Plaintiff Priestley to hold off on enforcing Plaintiff Priestley's rights under the "Senior Secured Promissory Note" and the additional loan subject to the "Senior Secured Promissory Note."

45.   During the period of time that Plaintiff Priestley's attentions were on her family, PanMedix did not obtain additional capital and experienced declining sales.  By January 2005, as PanMedix's business fortunes had not improved, Defendant Comrie began calling Plaintiff Priestly with requests for more operating cash to be put into PanMedix.

46. When Plaintiff Priestley took Defendant Comrie to task over the state of the business, including the declining sales numbers, Defendant Comrie responded to Plaintiff Priestley in a manner that would be a pattern of blaming others, in this instance by false accusations made against Plaintiff Priestley, in order to deflect attention away from Defendant Comrie's own failures.

47.   On January 19, 2005, Defendant Comrie sent a memorandum with the false assertion that Plaintiff Priestley did not allow Defendant Comrie to sign a deal with one "Stanley" to sell PanMedix to a company named Neurometrix.  Upon information and belief, Defendant Comrie's memorandum was a dishonest attempt by Defendant Comrie to justify why the terms of the "Senior Secured Promissory Note" continued not to be met.

13

48.  Contrary to Defendant Comrie's accusation, Plaintiff Priestley was unaware that there was in discussion a proposal to sell PanMedix to Neurometrix; Plaintiff Priestley never saw any document constituting an offer of sale and never met with, much less hold any discussion with a "Stanley."  Any such sale of PanMedix would have required Plaintiff Priestley's approval under the terms of the "Senior Secured Promissory Note."  To Plaintiff Priestley's knowledge, there was no such potential sale involving "Stanley," and there was no acceptance or refusal by Plaintiff Priestley to a deal with "Stanley."

49.  On January 26, 2005, Plaintiff Priestley sent a memorandum back to Defendant Comrie stating that Defendant Comrie's memorandum had completely misstated the facts.

50.  Plaintiff Priestley also demanded that Defendant Comrie withdraw his words of misrepresentation.

51.  On January 28, 2005, Defendant Conrie replied to Plaintiff Priestley with a note stating that it was not his intent that his statements be construed as negligence or malfeasance on Plaintiff Priestley's part.  Defendant Comrie's statement which did not comply with Plaintiff Priestley's demand that Defendant Comrie withdraw his words of misrepresentation.

52.  At this time, Plaintiff Priestley became concerned that PanMedix was insolvent.  Plaintiff Priestley had not been provided with financial reports and bank statements, to which she was entitled under the "Senior Secured Promissory Note" and as a shareholder.  Plaintiff Priestley expressed her concerns about company insolvency to Defendant Comrie, but he laughed off the stated concerns, reflecting the fact that

Defendant Comrie, Defendant Yee and Defendant Erlanger were acting irresponsibly to the problem of insolvency at PanMedix.

**E.      The Proposed Sention Deal.**

53.   In the summer of 2005, a company by the name of Sention, Inc. ("Sention") became financially troubled and its assets needed to be sold at a distressed price.  The assets of Sention made for an attractive acquisition for PanMedix.

54. Defendant Comrie, Defendant Yee and Defendant Erlanger, however, decided to set up a new company to acquire the Sention assets and not acquire them for or on behalf of PanMedix. They intentionally sought to exclude the shareholders of PanMedix from this opportunity.

55.   Defendant Comrie was advised by his own attorneys that he must disclose this interest in Sention to PanMedix debtholders and shareholders, but against this advice, Defendant Comrie, Defendant Yee and Defendant Erlanger did not make a general and full disclosure to PanMedix debtholders and shareholders.

56.   Plaintiff Priestley learned of Defendant Comrie's, Defendant Yee's and Defendant Erlanger's plan to set up a new company to acquire Sention assets from a casual conversation with Defendant Comrie. Plaintiff Priestley was concerned about what immediately appeared to her to be a diversion to Defendant Comrie, Defendant Yee and Defendant Erlanger personally of a corporate opportunity for PanMedix. Plaintiff Priestley was also dismayed by the failure of Defendant Comrie, Defendant Yee and Defendant Erlanger to disclose to PanMedix debtholders and shareholders, their plan to acquire Sention assets in a separate and unrelated corporate entity.

15

57. Plaintiff Priestley discussed with Defendant Comrie how Defendant Comrie and Defendant Erlanger intended to move their time and efforts to a new drug company, thereby abandoning PanMedix without any handover of executive responsibilities. Specifically, Plaintiff Priestley challenged Defendant Comrie as to why the drug discovery business could not be developed within PanMedix.

58. Defendant Comrie claimed to Plaintiff Priestley that it was his opinion that the combined business of PanMedix and his drug discovery proposal were not financiable together.

59. Plaintiff Priestley out-rightly challenged this supposition as the drug discovery proposal relied on the data and software of PanMedix, and the director expertise of PanMedix.

60. Defendant Comrie then made it clear that the new company would require use of PanMedix technology, data base and staff, in order to exploit Sention drugs. Defendant Comrie indicated that he would charge for the use of PanMedix technology, data base and staff at a minimum cost -- an arrangement that would give Defendant Comrie a profit for the exploitation of the Sention assets without PanMedix reaping such benefits for the use of its technology, data base and staff.

61. Plaintiff Priestley warned Defendant Comrie that he (Defendant Comrie) was completely wrong in his plan to acquire Sention assets with a new company but thereafter using PanMedix technology, date base and staff to exploit the Sention assets. Plaintiff Priestley further warned Defendant Comrie that she (Plaintiff Priestley) would be looking carefully at any license agreement and at any breach of fiduciary duty and malfeasance at PanMedix. Plaintiff Priestley also questioned Defendant Comrie about who would

manage PanMedix going forward in order to be able to service the needs of the proposed new venture, but Defendant Comrie was not responsive and gave no indication of having thought about this problem.

62. From this point onwards, Defendant Comrie described on many occasions how he had spent the prior eighteen months trying to construct this new opportunity. Defendant Comrie, Defendant Erlanger and Defendant Yee were neglecting the business of PanMedix in favour of personal alternative opportunities, which manifested itself in the decline in sales revenue at PanMedix during this period.

63. Defendant Comrie was looking for funding for this new venture from a number of sources including companies by the name of Reservoir Capital, and Chris Overbeck at Saratoga Capital.

64. Reservoir Capital declined to invest in either PanMedix or the new company set up by Defendant Comrie and Defendant Erlanger because of their continued failure to produce a business plan and to conduct the capital raise in a professional manner. It is alleged that this failure is a blatant breach of their duties as Chief Executive Office, President, Director and Chief Scientific Officer of PanMedix.

65. It is alleged that during 2005 Defendants Comrie, Yee and Erlanger continued to:

> (i) fail to develop and work to a business plan
>
> (ii) fail to develop the business
>
> (iii) fail to secure additional financial capital for PanMedix
>
> (iv) fail to clarify to the shareholders and debtholders the precise financial position of the company

(v) fail to fully disclose conflicts of interest with respect to their non-PanMedix activities to the shareholders and debtholders

**F.     Continued Defaults Under The "Senior Secured Promissory Note" and Continued Breaches of Duty In Continued Failures To Obtain Financing and Completion Without Disclosure Of The Sention Deal.**

66.   Defendant Comrie also sought financing for his new Sention assets project from one Chris Overbeck at a company by the name of Saratoga.  Defendant Comrie represented to Plaintiff Priestley that the problem with the potential deal with Chris Overbeck was that the offer was only at best $500,000 in financing, which was sufficient to acquire but insufficient to sustain operations with the Sention assets, estimated to be $10 million over the term of the project.

67.   Defendant Comrie never fully described the Sention deal "offered" to PanMedix by MPM Capital -- a deal as to which Defendant Comrie knew Plaintiff Priestley was interested in having full disclosure to her in order for her to give or withhold approval under the "Senior Secured Promissory Note."

68.   On November 11, 2005, Plaintiff Priestley sent a letter to Defendant Comrie asserting that it was depressing to see PanMedix after seven years having "pitifully few paying customers and nowhere near sufficient turnover to pay its skeletal staff."  Plaintiff Priestley asserted in her letter that she had funded the company trusting in Defendant Comrie's representations and she rejected Defendant Comrie's statement that PanMedix was professionally unfundable.  Plaintiff Priestley in her letter also pointed out that Defendant Comrie did not have a plan for how PanMedix will be managed and financed on a going forward basis, for which the Directors must bare responsibility.

69. Plaintiff Priestley concluded her letter with a reminder that Defendant Comrie as President of PanMedix was in breach of contract for (i) failure to pay debt, (ii) failure to provide financial information and (iii) failure to render status reports on patents. Defendant Comrie did not respond.

70. On November 20, 2005, Plaintiff Priestley sent a second "Notice of Default" to Defendant Comrie at PanMedix   On that date, the principal of the "Senior Secured Promissory Note" continued not to be paid and the interest owed under the "Senior Secured Promissory Note" continued not to be paid, and thus what were events of default under the "Senior Secured Promissory Note" were ongoing and continuing.   In that Notice of Default dated November 30, 2005, Plaintiff Priestley declared, as "Holder" of the "Senior Secured Promissory Note," the entire principal amount of the "Senior Secured Promissory Note" and all accrued interest forthwith to be due and payable.

71. On December 6, 2005, Defendant Comrie yet again resorted to blaming others, calling Plaintiff Priestley to accuse her of "killing" a deal with one Chris Overbeck because of her "issues" within PanMedix -- "issues" which went back to PanMedix's 2002 default under the "Senior Secured Promissory Note," which were well documented and which should have been disclosed to Chris Overback from the start along with all other obligations and liabilities of PanMedix.

72. This is a further dishonest fabrication by Defendant Comrie. Plaintiff Priestley has never met, spoken with or conversed with Overbeck.

73. In response, Plaintiff Priestley offered to meet with Defendant Comrie and Chris Overbeck and discuss the situation, but her offer was declined.

74. Defendant Comrie then asked Plaintiff Priestley to look at the Sention deal. Plaintiff Priestley responded by asking for details of the Sention deal with MPM and for financial information on PanMedix, as was her right to have in any event under the "Senior Secured Promissory Note." At that time PanMedix was extremely short of cash.

75. Defendant Comrie aggressively made repeated calls to Plaintiff Priestley asking her to make cash loans to PanMedix, while at the same time accusing Plaintiff Priestley of starving the business for not loaning more cash to the company.

76. Plaintiff Priestley, however, was reluctant to make further loans to PanMedix for a number of reasons: (i) the lack of honesty and disclosure on the part of Defendant Comrie, Defendant Erlanger and Defendant Yee; (ii) the company's undercapitalized financial situation and lack of product sales; (iii) Plaintiff Priestley's concern there were undisclosed liabilities of the company; and (iv) Plaintiff Priestley's weariness with Defendant Comrie's personal attacks on her.

77. A balance sheet drawn up for PanMedix as of December 7, 2005, showed: cash of negative $470.87; total accounts receivable of $17,612.61; total fixed assets of $320,156.59; total other assets of $826,723.86; total assets of $1,164,022.39; total current liabilities of $649,890.72; total long term liabilities of $2,675,356.27; retained earnings of negative $2,831,136.70; and total equity of negative $1,164,022.39. "Other Assets" included a loan to shareholder of $64,032.04 and a loan to Headminder, Inc. of $591,057.00.

78. On December 7, 2005, Plaintiff Priestley sent a letter to Defendant Comrie stating that it was not Plaintiff Priestley who was starving the business and that the financial predicament that Defendant Comrie found the company PanMedix to be in was

the direct result of misconceived management decisions of Defendant Comrie, Defendant Yee and Defendant Erlanger that had run down the business of PanMedix and had relied on Defendant Comrie's own fund raising that had not yielded a positive result.  Plaintiff Priestley wrote in her letter that she had attempted to help with the raising of capital for the company, but that Defendant Comrie had resisted her help.  Plaintiff Priestley also wrote that she would need time to do due diligence for the financing of PanMedix and the Sention Drug opportunity in normal course of business – time that months ago had been afforded to Overbeck and Reservoir but deliberately not to Plaintiff Priestley.

79. Plaintiff Priestley added that she still believed that PanMedix was a strong investment opportunity but that PanMedix needed new professional management going forward in order for Plaintiff Priestley to put any more money into the company.  This was not a demand for Defendant Comrie to resign, but for experienced professional management to be hired.  In the prior years, Defendant Comrie, Defendant Yee and Defendant Erlanger had failed to hire and employ experienced and qualified personnel to develop the PanMedix business. Plaintiff Priestley had been strongly recommended by several of the Venture and private equity firms that had looked at the business in the past, and declined to invest, to persuade the company to install a professional Chief Executive Officer.

80. At this time, Plaintiff Priestley, concerned to salvage her investment, sought to assist in acquiring the Sention assets. She engaged patent lawyers and corporate lawyers at her own cost. She sent a qualified and experienced consultant, Paul Samuel, to New York to assist Defendants Comrie, Erlanger and Yee in producing a financial business plan to assist in securing the necessary professional financing.

81.  On December 21, 2005, the Sention assets were acquired by a new company which entered into a license agreement with PanMedix, all without the knowledge and consent of Plaintiff Priestley as required by the "Senior Secured Promissory Note." The new company was financed by Chris Overbeck, and the acquisition could not have occurred but for the efforts of Defendant Comrie, Defendant Yee and Defendant Erlanger.  First of all, it was PanMedix, not Overbeck, that had the relationship with MPM (the sellers); and secondly, Defendant Comrie, Defendant Yee and Defendant Erlanger facilitated a license agreement between the new company and PanMedix to use PanMedix's intellectual property.

82.  The new company is structured so that the roles of Defendant Comrie, Defendant Yee and Defendant Erlanger are obscured in an attempt to avoid the claim of their usurping a corporate opportunity of PanMedix. It is known that Defendant Erlanger has a direct personal contract for fee with the new company.

83.  In January 2006, Plaintiff Priestley, still with no knowledge of the deal for the Sention assets having been made, arranged with Defendant Comrie for Paul Samuel to go to New York January 17-20, 2006, to discuss financing for PanMedix.  Defendants Comrie, Yee and Erlanger deliberately allowed her to waste further time and money.

84.  On January 15, 2006, Defendant Erlanger sent an e-mail saying that he could not meet with Mr. Samuel at any time all week, and the meeting was not held.  He did not make any reference to the developments that had occurred. The clear inference is he was a full participating party in the decision to exclude Priestley in breach of the terms of the Note.

85.   Plaintiff Priestley, learning of the cancellation of the meeting with Mr. Samuel, contacted Defendant Comrie, and only then was told about the Sention deal already having been made.  Plaintiff Priestley, upon learning of the license arrangement, challenged Defendant Comrie that the license was a breach of the "Senior Secured Promissory Note." Defendant Comrie admitted to Plaintiff Priestley that the Sention deal was a breach of the "Senior Secured Promissory Note," but in turn challenged Plaintiff Priestley to do something about it, knowing that this would be difficult for Plaintiff Priestly, who was grieving from the untimely death of her sister in an accident weeks previously on December 21, 2005.

86.   When Plaintiff Priestley was thereafter given the opportunity to review the documents, she saw that the deal had made PanMedix assets available for the use by the new company and for the personal profit of Defendant Comrie and Defendant Erlanger with only a relatively small and unremunerative amount of payment to PanMedix.  The license provided for the repayment of some costs and only four months of a $55,000 payment. Crucially it also gave up copies of PanMedix software to the new company for no value.   The deal was to Defendant Comrie's, Defendant Yee's and Defendant Erlanger's personal advantage, but to the disadvantage of PanMedix.

87.   In the wake of a continued failure by Defendant Comrie to obtain financing for PanMedix, on February 23, 2006, Plaintiff Priestley sent a "Notice of Court Action" to Defendant Comrie at PanMedix.  In that Notice of Court Action dated February 23, 2006, Plaintiff Priestley, as "Holder" of the "Senior Secured Promissory Note," formally advised PanMedix and Defendant Comrie of the continuing default under the "Senior Secured Promissory Note" per the prior written Notices of Default; thus, the entire

principal amount of the "Senior Secured Promissory Note" and all accrued interest forthwith were and are due and payable.

88.   By the spring of 2006, Defendant Comrie had thoroughly alienated venture capital companies.   On or about May 15, 2006, one principal of a venture capital company wrote to Defendant Comrie that her venture capital company was not going to invest in PanMedix.   The response of Defendant Comrie has been to continue to blame the business, to continue to blame others (including Plaintiff Priestley) for what were Defendant Comrie's failures, to continue not to pay interest to Plaintiff Priestley on her loans to PanMedix under the "Senior Secured Promissory Note" and to continue to hold hostage Plaintiff Priestley's rights under the "Senior Secured Promissory Note."

89.  In the summer of 2006, Defendant Comrie made written representations to Plaintiff Priestley that PanMedix would be in a position by November 2006 to commence payment of interest; however, in continued violation of the "Senior Secured Promissory Note," no such interest has been paid.

## AS AND FOR THE FIRST CAUSE OF ACTION
### (Individually: For Breach of Loan Note Agreement)

90.   Plaintiff Priestley repeats and realleges paragraphs 1 through 89 as if fully set forth herein.

91.   Under the "Senior Secured Promissory Note," PanMedix is legally obligated to repay the stated principal amounts loaned by Plaintiff Priestley pursuant the Senior Secured Promissory Note ($750,000.00) and to pay the accrued interest on that principal at the rates set by the Senior Secured Promissory Note; and due demand has been made therefor.   Under the "Senior Secured Promissory Note," EKP   is the guarantor of all amounts owed by PanMedix under said "Senior Secured Promissory Note"; and

Headminder is also so obligated under the "Senior Secured Promissory Note" due to the *de facto* merger of PanMedix and Headminder.

92.   PanMedix is in breach of the Senior Secured Promissory Note by (among other things): failing, at the direction of Defendant Comrie, to repay the stated principal amounts loaned by Plaintiff Priestley under the Senior Secured Promissory Note ($750,000.00); failing, at the direction of Defendant Comrie, to pay the accrued interest on that principal at the rates set by the Senior Secured Promissory Note; failing, at the direction of Defendant Comrie, to provide regular financial disclosures to Plaintiff Priestley concerning the financial condition of the company; and failing, at the direction of Defendant Comrie, to provide financial disclosures to Plaintiff Priestley concerning prospective deals and actual deals (including one involving the Sention assets) affecting PanMedix.

93.   Plaintiff Priestley has been damaged by and is legally entitled to recover from PanMedix, EKP and Headminder for the failure of PanMedix, in breach of the Senior Secured Promissory Note, to repay the stated principal amounts loaned by Plaintiff Priestley under the Senior Secured Promissory Note ($750,000.00) and to pay the accrued interest on that principal at the rates set by the Senior Secured Promissory Note.

## AS AND FOR THE SECOND CAUSE OF ACTION
### (Individually: For Breach of Loan Note Agreement)

94.   Plaintiff Priestley repeats and realleges paragraphs 1 through 93 as if fully set forth herein.

95.   Under the "Senior Secured Promissory Note," PanMedix is legally obligated to repay the additional principal amounts loaned by Plaintiff Priestley pursuant the Senior

Secured Promissory Note ($85,000.00) and to pay the accrued interest on that principal at the rates set by the Senior Secured Promissory Note; and due demand has been made therefor. Under the "Senior Secured Promissory Note," EKP is the guarantor of all amounts owed by PanMedix under said "Senior Secured Promissory Note"; and Headminder is also so obligated under the "Senior Secured Promissory Note" due to the *de facto* merger of PanMedix and Headminder.

96.     PanMedix is in breach of the Senior Secured Promissory Note by (among other things) failing, at the direction of Defendant Comrie, to repay the additional principal amounts loaned by Plaintiff Priestley under the Senior Secured Promissory Note ($85,000.00); failing, at the direction of Defendant Comrie, to pay the accrued interest on that principal at the rates set by the Senior Secured Promissory Note; failing, at the direction of Defendant Comrie, to provide regular financial disclosures to Plaintiff Priestley concerning the financial condition of the company; and failing, at the direction of Defendant Comrie, to provide financial disclosures to Plaintiff Priestley concerning prospective deals and actual deals (including one involving the Sention assets) affecting PanMedix.

97.     Plaintiff Priestley has been damaged by and is legally entitled to recover from PanMedix, EKP and Headminder for the failure of PanMedix, in breach of the Senior Secured Promissory Note, to repay the additional principal amounts loaned by Plaintiff Priestley under the Senior Secured Promissory Note ($85,000.00) and to pay the accrued interest on that principal at the rates set by the Senior Secured Promissory Note.

## AS AND FOR THE THIRD CAUSE OF ACTION
### (Derivative: For Breach of Fiduciary Duty of Loyalty)

98.   Plaintiff Priestley repeats and realleges paragraphs 1 through 97 as if fully set forth herein.

99.   Defendant Comrie, Defendant Yee and Defendant Erlanger have owed and owe a fiduciary duty of undivided and unqualified loyalty to PanMedix that includes Defendant Comrie not promoting personal interests incompatible with the superior interests of the corporation.

100.   Defendant Comrie, Defendant Yee and Defendant Erlanger breached their duty of loyalty to PanMedix by structuring a license agreement with a new company for the Sention assets to the disadvantage and unfair exploitation of PanMedix but to the personal profit of Defendant Comrie, Defendant Yee and Defendant Erlanger.  Upon information and belief, the Sention assets are worth up to $100 million at an investment cost of $10 million in the last 12 months.

101.   No demand on the PanMedix Board was required in this case with respect to Defendant Comrie's, Defendant Yee's and Defendant Erlanger's breach of his duty of loyalty, as such demand would have been futile given Defendant Comrie and Defendant Yee's domination and control of the Board of Directors of PanMedix.

102.   PanMedix has been damaged and is legally entitled to recover for the damages proximately caused by Defendant Comrie's, Defendant Yee's and Defendant Erlanger's breach of his fiduciary duty of loyalty.  Had Defendant Comrie, Defendant Yee and Defendant Erlanger not breached their duty of loyalty, PanMedix would have earned a fair return on its assets, technology and employee labors.

## AS AND FOR THE FOURTH CAUSE OF ACTION
### (Derivative: For Breach of Fiduciary Duty of Care)

103.   Plaintiff Priestley repeats and realleges paragraphs 1 through 102 as if fully set forth herein.

104.   Defendant Comrie, Defendant Yee and Defendant Erlanger have owed and owe a fiduciary duty of care to PanMedix.

105.   Defendant Comrie, Defendant Yee and Defendant Erlanger  breached their duty of care to PanMedix by his actions, not protected as a matter of business judgment, in: among other things, (i) prolonged failures to raise capital to operate the PanMedix business, thus failing properly to capitalize the PanMedix business, due to (among other things) the failure to develop business plans and projections and engage in professional fund raising in order to attract venture capital; (ii) failures to develop and market products for market sales; (iii) failures to have operating budgets; (iv) failures in allowing business assets to waste; (v) failures in hiring and employing experienced and qualified personnel to develop the PanMedix business; (vi) failures to take proper actions when PanMedix was insolvent; (vii) failures to make proper reports to shareholders and senior debtholders; (viii) failures to avoid legal liabilities; and (ix) Defendant Comrie's propensities to engage in blaming others rather than focus on the requirements for building the PanMedix business.

106.   No demand on the PanMedix Board was required in this case with respect to Defendant Comrie's, Defendant Yee's and Defendant Erlanger's breach of his duty of care, as such demand would have been futile given Defendant Comrie's and Defendant Yee's domination and control of the Board of Directors of PanMedix.

107.   PanMedix has been damaged and is legally entitled to recover for the damages proximately caused by Defendant Comrie's, Defendant Yee's and Defendant Erlanger's breach of his fiduciary duty of care.   Had Defendant Comrie, Defendant Yee and Defendant Erlanger not breached their duty of care, PanMedix would have been a profitable company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Priestley demands judgment as follows:

(i)  On the First Cause of Action against PanMedix, EKP and Headminder, for a Judgment in an amount to be determined at trial but no less than $1,131,750.00 (one million one hundred thirty-one thousand seven hundred fifty dollars);

(ii)   On the Second Cause of Action against PanMedix, EKP and Headminder, for a Judgment in an amount to be determined at trial but no less than $125,800.00 (one hundred twenty-five thousand eight hundred dollars);

(ii)  On the Third Cause of Action against Defendant Comrie, Defendant Yee and Defendant Erlanger for a Judgment in favor of PanMedix in an amount to be determined at trial but no less than $10,000,000.00 (ten million dollars); and

(iv)  On the Fourth Cause of Action against Defendant Comrie, Defendant Yee and Defendant Erlanger  for a Judgment in favor of PanMedix in an amount to be determined at trial but no less than $15,000,000.00 (fifteen million dollars); and

(v)  Granting such other and further relief as to the Court deems just and

proper, together with the fees, costs and disbursements of this action.

**Dated:** **February 16, 2007**
        **New York, New York**

                              **NESENOFF & MILTENBERG, LLP**

                              **By:** _____
                                    Philip A. Byler, Esq. (PB 1234)

                              **Attorneys for Plaintiff Katherine Priestley**
                              **363 Seventh Avenue - 5th Floor**
                              **New York, New York 10001**
                              **212.736.4500**